**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 09-CR-0332 (-2) |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| GLENN LEWELLEN | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Glenn Lewellen ("Lewellen"), a 64-year-old former Chicago police officer diagnosed with severe obesity, hypertension, and a heart condition (atrial fibrillation), moves under 18 U.S.C. § 3582(c)(1)(A)(i) for what is commonly called compassionate release. When Lewellen was sentenced to serve 18 years in prison for a drug-trafficking conviction, this court stated that it intended its sentence to be sufficient, but not greater than necessary, to, among other things, provide just punishment for Lewellen's serious crime and to deter others from committing similar crimes. *See* Sentencing Tr. 143–46, ECF No. 1396. The court departed downward from the range of punishment recommended by the advisory United States Sentencing Guidelines in part because, in the court's view, Lewellen had rehabilitated himself, personally and spiritually. *See id.* at 143–44. In view of his rehabilitation and his age, the court concluded that the chance he would be a danger to the public again was "fanciful." *Id.* at 143. The court therefore expressly declined to impose a *de facto* "life sentence" and instead selected a term of imprisonment that accounted for the seriousness of Lewellen's crimes and was consistent with other sentences imposed in this case. *Id.* at 145–46.

The compassionate release statute permits a sentence modification for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). Lewellen's medical conditions and his age put him at serious risk if he contracts COVID-19, according to guidance from the Centers for

1

Disease Control and Prevention ("CDC"). His medical conditions also number among the most common comorbidities (that is, other conditions of ill health) of COVID-19 patients who require hospitalization.[1] The COVID-19 pandemic, combined with Lewellen's risk factors, constitute extraordinary and compelling circumstances that the court did not and could not have foreseen at sentencing. For the following reasons, and to advance the objectives articulated at sentencing, the court grants the motion.

## Background

The 13-count Third Superseding Indictment charged 11 defendants in a wide-ranging drug-trafficking and racketeering operation. *See generally* Third Superseding Indictment, ECF No. 274. The drug-trafficking organization operated from approximately 1998–2009. The evidence at trial showed that Lewellen, in coordination with co-defendant Saul Rodriguez and others, would sometimes pretend to be on official police business to steal drugs or money from others involved in the drug trade. *See United States v. Cardena*, 842 F.3d 959, 971 (7th Cir. 2016) (summarizing facts on appeal); *United States v. Lewellen*, 2012 WL 13187775, at *1 (N.D. Ill. Oct. 26, 2012) (same on motion for new trial or for judgment of acquittal).

Lewellen was charged in two counts. The first (Count 1) alleged racketeering conspiracy. *See* 18 U.S.C. § 1962(d). Count 13 charged Lewellen and others with participating in a conspiracy to possess more than five kilograms of cocaine with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1), (846); Third Superseding Indictment at 6, 34.

Six defendants, including Lewellen, went to trial. In 2012, after hearing more than three months of evidence, the jury convicted Lewellen on the possession with intent to distribute

---

[1] Lewellen cites the following article in his motion for compassionate release, and the government has not challenged it. *See* Molly Walker, *Hypertension, Obesity Common in U.S. COVID-19 Hospitalizations,* MedPage Today (April 8, 2020) (citing CDC's Morbidity and Mortality Weekly Report), https://www.medpagetoday.com/infectiousdisease/covid19/85855.

count. The jury, however, could not reach a verdict on the racketeering conspiracy charge. *See* Jury Verdict, ECF No. 803.

The court sentenced Lewellen to serve 18 years in prison. Lewellen had no prior criminal history. Pre-Sentence Report ("PSR") at 41, ECF No. 915. The drug quantity charged in the indictment required at least a 10-year mandatory minimum sentence. *See* 21 U.S.C. § 841(b)(1)(A)(ii). And the quantity of drugs found at sentencing largely drove Lewellen's recommended guidelines sentence of life imprisonment. *See* PSR at 39–40.

Lewellen's sentencing was held on May 20, 2013. This court began its pronouncement of sentence by discussing its history supervising Lewellen, which dated to the setting of his bond. *See* Sentencing Tr. 142. When the court released Lewellen on bond, "it was [the court's] deep belief that Mr. Lewellen was in the process of becoming a new person -- and I mean new, I mean it in the religious sense . . . -- and that he had important work to do, and that I wanted to do what I could do to give him the opportunity to do that." *Id*. Based on what the court heard and observed throughout the case, the court explained that "I don't believe that Mr. Lewellen poses a risk of personal recidivism. I think his age would probably be a good reason why that would not happen. Even if I were to sentence him to the mandatory minimum, the chance that he would get out of prison and commit another crime I think is fanciful." *Id*. at 143.

The court also found public interest considerations to be aggravating factors weighing in favor of a sentence above the mandatory minimum. *See id*. at 143–44 ("[I]f there was ever a case in which there was interest in general deterrence, this is it."). Four "serious enhancements" favored a sentence above the mandatory minimum: "the use of a firearm in connection with the commission of these offenses, the restraint of victims, the evidence of obstruction of justice, and . . . abuse of a position of trust." *Id*. at 145. After considering the required statutory factors, the

3

court balanced the need "to make sure that the sentence was serious enough and was not out of line with other [lengthy] sentences that have been imposed in this case" to fashion a sentence that also gave Lewellen "the hope of eventually being able to reunite with his family." *Id.* at 145–46.

In the motion now before the court, Lewellen's lawyers describe him as a "model inmate." Mot. Compassionate Release 5, ECF No. 1868. He has accumulated no documented prison disciplinary history in nearly nine years. *Id.* The government does not contest these representations.

Assuming that Lewellen continues to have no disciplinary record, the Federal Bureau of Prisons ("BOP") projects that he will be released in November 2026. Resp. Mot. Compassionate Release 7, ECF No. 1887. Using the BOP's projection, Lewellen has a little less than 78 months to serve. He has served approximately 106 months of his sentence. *Id.* at 8. Lewellen has therefore been imprisoned for approximately 57.6% (106 of the 184 months of the time BOP projects he will serve. *Cf.* Sentencing Tr. 145 (assuming Lewellen would receive good time credit when formulating sentence).

On May 6, 2020, Lewellen filed his pending motion for compassionate release due to his health conditions and the COVID-19 pandemic. ECF No. 1868. Lewellen has served his sentence at a BOP facility in Sumterville, Florida, designated as "FCI-Coleman (low)." *Id.* at 7.

Lewellen attaches two affidavits to his motion. The first is the affidavit of Brie Williams, M.D., a doctor who describes in general terms the risks of rampant spread of COVID-19 created by conditions typically found in prisons, including federal prisons. *See* ECF No. 1868-1. Lewellen also submits the affidavit of his uncle, Thomas Dukes ("Dukes"), who lives in Frankfort, Illinois and with whom Lewellen lived while he was on bond before trial. *See* ECF No. 1868-4 ¶¶ 2–3. Dukes avers that he will house Lewellen at his home if he is released, and

4

Dukes pledges to help to ensure that Lewellen complies with all conditions of release to home confinement. *Id.* ¶¶ 4–5.

## Exhaustion of Administrative Remedies

After the passage of the First Step Act of 2018 ("First Step Act"), Pub L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), a defendant may file a motion for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A) (West 2020). The government concedes that Lewellen has fully exhausted his administrative remedies. Resp. to Mot. Compassionate Release 15, ECF No. 1877. The record shows that Lewellen submitted a request for compassionate release to the warden at FCI-Coleman (low) on or before April 9, 2020. ECF No. 1868-2. The warden denied the request that same day. *Id.* Because exhaustion is not at issue and more than 30 days have passed since the warden's decision, the court proceeds to the merits.[2]

## Discussion

Before the enactment of the First Step Act and the outbreak of the COVID-19 global pandemic, the United States Sentencing Commission promulgated a policy statement providing a non-exhaustive list of extraordinary and compelling circumstances and specific criteria for each. *See* U.S.S.G. § 1B1.13. The specific circumstances broadly cover compassionate release based on the defendant's medical condition, age, and family circumstances. *See id.* cmt. n.1(A)–(C). The list also includes a catch-all provision: "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions

---

[2] The warden's denial letter advised Lewellen that he had the right to appeal the warden's decision within 20 days. ECF No. 1868-2 at 2.

(A) through (C). *Id.* cmt. n.1(d). "[N]early all district courts hold that—since the [First Step Act]'s passage —section 1B1.13 is not binding but is, rather, helpful guidance." *United States v. Almontes*, 2020 WL 1812713, at *3 (D. Conn. Apr. 9, 2020) (collecting cases). This court has previously joined "the vast majority" of district courts to conclude that while the criteria in § 1B1.13 provides useful guideposts, the court may look beyond the defendant's medical condition, age, and family circumstances, as delineated in the Sentencing Commission's guidance, to construe what constitutes extraordinary and compelling reasons under § 3582(c)(1)(A)(i). *Id.*, *quoted in United States v. Robert Cardena*, No. 09-CR-0332 (-11), slip op. at 6 (N.D. Ill. May 15, 2020) (ECF No. 1890).

This is a very close case. At sentencing, the court departed substantially from the guidelines to provide Lewellen with hope that he would eventually be released and be able to have some post-rehabilitation life experience with his family, without deprecating the very serious nature of the offense. But for the reasons discussed below, the court concludes that Lewellen's diagnosed medical conditions combined with the threat of exposure to COVID-19 and the fact that he has served a substantial portion of his sentence create extraordinary and compelling circumstances.

The government primarily argues that Lewellen raises no more than a "generalized concern" about possible COVID-19 exposure, which at least one judge of this court has stated is insufficient to warrant compassionate release. *See United States v. Gold*, 2020 WL 2197839, at *2 (N.D. Ill. May 6, 2020) (Bucklo, J.). Lewellen faces a relatively low risk of immediate infection, argues the government, because the BOP reports that only one inmate and one staff member at FCI-Coleman (low) have tested positive for COVID-19, and the staff member has

recovered.[3]  The government adds that Lewellen's prison medical records do not show that Lewellen is presently exhibiting symptoms, and, if anything, he is receiving appropriate care. Resp. to Mot. Compassionate Release 18, ECF No. 1877.  The government also asserts that Dr. Williams's affidavit is too general because she neither examined Lewellen nor opines on the conditions at FCI-Coleman (low).  *See id.* at 19–20.

But Lewellen raises more than a generalized fear about his susceptibility if he contracts COVID-19.  As described in *Gold*, the defendant based his request for compassionate release on medical conditions which were "common and [did] not appear to be among those the CDC ha[d] identified as significant risk factors."  2020 WL 2197839, at *2.  In contrast, Lewellen's prison medical records confirm that he has been diagnosed with, and treated for, severe obesity, hypertension, and atrial fibrillation; he takes three daily medications for his heart condition.[4] *E.g.*, ECF No. 1886 at 3 (filed under seal).  Not only do these conditions appear on the CDC's list of recognized COVID-19 risk factors; they also number among the most common comorbidities for COVID-19 hospitalization.[5]  And while hypertension might be common among prisoners (the court has no evidence on this), there is no reason to think that Lewellen's heart condition, or his other conditions, is common. And while Lewellen's medical conditions may not be uncommon among older inmates, the fact remains that these are important comorbidities for serious COVID-19 illness.

---

[3] *COVID-19*, Federal Bureau of Prisons (last visited May 21, 2020), https://www.bop.gov/coronavirus/index.jsp.

[4] In December 2019, a doctor also ordered a a test for possible diabetes. ECF No. 1886 at 77. The results of that testing, if any, are unknown. *See* Reply 1, ECF No. 1894 (mentioning the test without citing evidence of an outcome).

[5] *See supra* notes 1–2.

The government's suggestion that Lewellen would be at greater risk if he were exhibiting symptoms of his diagnosed conditions does not diminish the COVID-19 risk factors identified by the CDC, nor does the government explain why he is being medicated if he is symptom free. [6] According to the CDC, people with identified risk factors have an increased chance of having more severe COVID-19 symptoms if they contract the disease.[7] Thus, numerous courts, including this one, have relied on the CDC's list of risk factors, taking them at their stated level of generality, when assessing compassionate release motions during the COVID-19 crisis. *E.g., Gold*, 2020 WL 2197839, at *2; *see also Mays v. Dart*, 2020 WL 1987007, at *2 (N.D. Ill. Apr. 27, 2020).

The government is correct that Dr. Williams did not treat Lewellen and that Dr. Williams did not visit FCI-Coleman (low) or mention the facility in her affidavit. *See* ECF No. 1868-1 ¶ 4. The government's response brief shows why producing a specific medical or facility analysis is close to impossible for Lewellen at this time. As part of its plan to respond to the COVID-19 outbreak, the government represents that the BOP has, among other things, "suspend[ed] social visits, in-person legal visits, all inmate movement, and staff travel." Resp. to Mot. Compassionate Release 9 (citing BOP website). Under present BOP restrictions, then, arranging a medical examination for Lewellen, or any other prisoner, by an outside doctor appears nearly impossible. Gathering information about the COVID-19-related conditions inside BOP facilities would be equally difficult, except of course for the limited information provided by the BOP itself. Indeed, even the government relies on the BOP's website for its information. *See id.* at 8.

---

[6] The court has not been directed to any evidence that exhibiting symptoms, or not, affects the risks if someone contracts COVID-19, and it may be that the virus has emerged too recently to know.

[7] *See Coronavirus Disease 2019: How It Spreads*, CDC (last visited May 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

The level of specificity in the evidence Lewellen has marshalled therefore appears to be reasonable in view of the present barriers to gathering specific evidence of a prisoner's medical conditions and the conditions at BOP facilities.

This brings the court to the relatively small number of BOP-reported cases at FCI-Coleman (low). The number sheds little light on Lewellen's risk of contracting COVID-19. The government says, in essence, that the BOP's figures demonstrate that the BOP's efforts to mitigate the spread of COVID-19 are working. Lewellen counters that the number of cases at FCI-Coleman (low) is so few (below the BOP system-wide averages) that the BOP's published figures must understate the prevalence of COVID-19 within the facility. Reply 6, ECF No. 1894.

Lewellen's position has some support. He cites a report that over 70% of BOP inmates tested for COVID-19 test positive.[8] However the BOP publicly disputes the significance of this number. *Id.* The BOP also stated on May 1, 2020, that it would begin testing asymptomatic individuals, as well as individuals showing COVID-19 symptoms, "[a]s increased testing opportunities become available." *Id.* But this court does not know whether any such opportunities have materialized. Thus, the number of cases reported by the BOP at FCI-Coleman (low) has very limited probative value in predicting the chance of a particular inmate's exposure to the virus.[9] *Cf. Wilson v. Williams*, 2020 WL 2542131, at *12 ((N.D. Ohio May 19, 2020) discussing disparities between BOP-related COVID-19 prevalence data for a facility and

---

[8] Luke Barr, *70% of Inmates Tested Have COVID-19: Bureau of Prisons*, (May 1, 2020), https://abcnews.go.com/US/70-inmates-tested-covid-19-bureau-prisons/story?id=70454527.

[9] *See* Victor Pavlo, *Federal Judges Are Relying on Bureau of Prisons' COVID-19 Numbers To Make Rulings*, (May 20, 2020), https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#2b3e445512c7.

the results of court-ordered testing at the facility). More than anything, however, the parties' arguments underscore the difficulty of gathering evidence and evaluating compassionate release motions in the present circumstances.[10]

In reply, Lewellen represents that prisoners from different dorm units at FCI-Coleman (low) are permitted to mingle at meal times and that food service workers do not wear masks or gloves. ECF No. 1894 at 6. Prisoners from different units also mingle at religious services with clergy; again, members of the outside community do not wear masks or gloves according to Lewellen's reply. *Id*. If true, these practices raise real concerns about possible transmission of COVID-19 at FCI-Coleman (low). *See Mays*, 2020 WL 1987007 at *34 (finding that detainees in county jail faced threat of irreparable harm in putative class action concerning prison conditions and possible spread of COVID-19).

The government emphasizes the serious crimes committed by members of the drug-trafficking organization in this case–murder, kidnapping, robbery, drug distribution, and obstruction of justice–and stresses the need for general deterrence and to promote respect for the law. *See* Resp. Mot. Compassionate Release 2–4, 23–24. For whatever it is worth, this court sat through this lengthy trial, and while it found Lewellen's conduct heinous, it also found the government's view of Lewellen's role as the "CEO" exaggerated; the "guardian angel" characterization was more accurate. *Id*. at 2

This court expressly took into account the seriousness of the offense, the need to promote respect for the law, and the aggravating factors, such as use of a firearm and Lewellen's abuse of a position of public trust, when it sentenced him. *See* Sentencing Tr. 144–46. Since the jury

---

[10] There is some reason to be concerned about the BOP's response to the COVID-19 outbreak. A federal judge in Ohio recently found that the BOP made "minimal efforts" to comply with a preliminary injunction requiring it to implement testing and transfer prisoners out of a low-security facility in which a COVID-19 outbreak is ongoing. *See Wilson, 2020* WL 2542131 *at *12.*

could not reach a verdict on the racketeering charge against Lewellen, the court made specific findings about the trial evidence: "the evidence in this case . . . suggested that for some lengthy period of time [Lewellen] went in another direction, but it seems to me that he has found himself again. So that is, in terms of history and characteristics, what I find." *Id*. at 144.

The court knows of no authority allowing it to revisit, as the government would have it, these sentencing findings and relitigate issues decided at sentencing. In the closely related context of a sentence modification under 18 U.S.C. § 3582(c)(2), which concerns a sentence that has been lowered by a retroactive amendment to the sentencing guidelines, the Seventh Circuit has held that at re-sentencing a court "cannot make findings *inconsistent with* that of the original sentencing court." *United States v. Duncan*, 639 F.3d 764, 768, (7th Cir. 2011) (quoting *United States v. Woods*) (emphasis in original); *see also United States* v. *Hall*, 600 F.3d 872, 876 (7th Cir. 2010); *United States v. Span*, 2020 WL 549631, at *6–8 (N.D. Ill. Feb. 6, 2020).

In any event, this record further supports the court's findings. The court's experience supervising Lewellen before trial led it to conclude that any prospects of his reoffending were "fanciful"–even if the court sentenced him only to the statutory mandatory minimum of ten years. Sentencing Tr. 143. Lewellen's conduct on bond was exemplary. And it is undisputed that Lewellen has no documented discipline in his nearly nine years in prison. That is, the available evidence of nearly nine more years of Lewellen's conduct confirms the court's sentencing findings: Lewellen has changed. He presents a very low risk to the public. *See id*.

Also significant is the need to avoid unwarranted disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6). Since Lewellen was sentenced, a change in the law resulted in co-defendant Hector Uriarte's statutory mandatory minimum sentence of 42 years being lowered to 20 years. *See* Am. J., ECF No. 1806, *appeal docketed* No. 19-2092 (7th Cir. June 10,

11

2019); *United States v. Hector Uriarte*, mem. op. at 1–3 (N.D. Ill. Apr. 25, 2019) (ECF No. 1835 (explaining the changes made to the recidivist firearms statute, 18 U.S.C. § 924(c), made by the First Step Act, that led to Mr. Uriarte's decreased sentence). A desire to avoid disparities with Hector Uriarte's very long mandatory minimum sentencing (as well as the sentences of other co-defendants), drove up Lewellen's sentence. *See* Sentencing Tr. 145. Now that Congress has lowered Hector Uriarte's mandatory minimum by more than two decades and the court has again sentenced him to the mandatory minimum, Congress's judgment that a co-defendant's sentence was decades too long places downward pressure on Lewellen's sentence as well.

Furthermore, and importantly, Lewellen has family support and a good reentry plan. This matters because Lewellen will be skipping the BOP's program to assist with the transition to life after prison. His uncle in Frankfort, Illinois, who is familiar with him and his history, has agreed to house him and ensure that he complies with home confinement and other conditions of release. *See* Dukes Aff, ECF No. 1868-4. Lewellen also has the support of his daughter, who communicates with him more than once a week. Reply 7, ECF No. 1894. And he has identified a physician who is prepared to arrange COVID-19 testing and to manage his medical conditions. *Id*.

Lewellen has served approximately 57.6% of the time he is projected to spend in prison. Lewellen has spent more than nine years in custody, and while those involved in the federal criminal system are accustomed to long sentences, nine years is a long time by any measure. Lewellen is 64 years old with multiple health conditions including a heart condition. Every indication is that he has been rehabilitated. Meanwhile, if Lewellen's representations are true, social distancing practices at FCI-Coleman (low) create a daily risk of COVID-19 transmission. As Lewellen argues, at least one court has granted compassionate release to defendants who, like

Lewellen, pose a low risk of future danger to the public–sometimes having served far less of their sentence than has Lewellen.[11] *See United States v. Gonzales*, 2020 WL 1536155, at *1–3 (E.D. Wash. Mar. 31, 2020) (white collar defendant served one month of a ten-month sentence; defendant housed in state jail with inadequate social distancing measures; defendant had "chronic illnesses" that were neither terminal nor diminished her ability to care for herself).

Ultimately, although the issue is difficult, the court finds that Lewellen's age and diagnosed medical conditions coupled with the risks presented by the COVID-19 outbreak constitute extraordinary and compelling reasons for a sentence reduction under § 3582(c)(1)(A). The court therefore weighs applicable program statements and the statutory factors it considered when it sentenced Lewellen. 18 U.S.C. § 3852(c)(1)(A) (West 2020) (cross-referencing § 3553(a)).

For these and all of the foregoing reasons, the court determines that the serious risks of Lewellen's diagnosed health conditions should he contract COVID-19 do not justify a further custodial sentence. Considering the threat that COVID-19 poses to older prisoners diagnosed with conditions like Lewellen's, the court's original sentencing objectives of accounting for the seriousness of Lewellen's offense without imposing a *de facto* life sentence can be best realized through his release. He will continue to be under a court-ordered term of supervised release, and he will be able to quarantine with supportive family and receive treatment for his medical conditions.

---

[11] The government attempts to distinguish some of the other cases on which Lewellen relies based on the nature of the defendant's offense, the amount of time served, the nature of the defendant's medical conditions, and other case-specific factors. *See* Resp. Mot. Compassionate Release 21–23. The court has considered these cases but deems exigesis of each to be counterproductive. As one district court has recently observed, "Ultimately, every [compassionate release] case must be decided on its own facts, which may include the time remaining on the defendant's sentence, the conditions at the prison where he is housed, and the safety and stability of his release plan." *United States v. Scott*, 2020 WL 2508894, at * 9 n.9 (E.D. Wis. May 15, 2020) (collecting cases in which relief was granted and distinguishing them on their facts).

**Conclusion**

For the reasons stated, defendant Glenn Lewellen's motion for compassionate release is granted. Mr. Lewellen's sentence is modified to time served. An amended judgment shall issue immediately.

The court requests that the probation officer to whom Mr. Lewellen's case is assigned in Chicago solicit his consent to some limited period of home confinement upon his return to Chicago to facilitate his reentry plan. If he refuses to consent, the probation office is invited to request the court's guidance.

Date:   May 22, 2020        _____/s/_____

                                 Joan B. Gottschall
                                 United States District Judge